HSG, LLC v. Edge-Works Manuf. Co., 2015 NCBC 87.

STATE OF NORTH CAROLINA

COUNTY OF ONSLOW

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 309

HSG, LLC d/b/a "HIGH SPEED GEAR," )
           Plaintiff, )
            )
            )
          v. )
            )
EDGE-WORKS MANUFACTURING )
COMPANY d/b/a "G-CODE )
HOLSTERS AND ACCESSORIES," )
ALBERT GENE HIGDON, JR., )
REBECCA A.HIGDON, MEAN GENE )
LEATHER, an Unincorporated Business )
Association, and HIGH SPEED GEAR, INC., )
a Dissolved North Carolina Corporation, )
          Defendants. )

**OPINION AND ORDER**

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court on Defendant Edge-Works Manufacturing Company d/b/a "G-Code Holsters and Accessories" ("G-Code")'s Motion to Dismiss Claims for Breach of Contract, Tortious Interference, and Disgorgement of Profits ("G-Code's Motion to Dismiss") and Plaintiff-Counterclaim Defendant HSG, LLC d/b/a "High Speed Gear" ("HSG")'s Motion to Dismiss Counterclaims of Defendants Albert Gene Higdon, Jr. and Mean Gene Leather ("HSG's Motion to Dismiss") (collectively, "Motions"), pursuant to Rule 12 of the North Carolina Rules of Civil Procedure ("Rule(s)"). On July 2, 2015, the Court held a hearing on the Motions.

THE COURT, after considering the Motions, the briefs in opposition and support thereof, arguments of counsel, and other appropriate matters of record, CONCLUDES as stated herein.

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Andrew L. Rodenbough, Esq., Jim W. Phillips, Jr., Esq., and Thomas G. Varnum, Esq., for Plaintiff.*

*Shanahan Law Group PLLC, by Kiernan J. Shanahan, Esq., Brandon S. Neuman, Esq., and John E. Branch, Esq., and Intellectual Property Consulting, LLC, by Gregory D. Latham, Esq., for Defendants Edge-Works Manufacturing Company d/b/a "G-Code Holsters and Accessories."*

*The Coxe Law Firm PLLC, by Matthew C. Coxe, Esq., for Defendants Albert Gene Hidgon, Jr. and Mean Gene Leather.*

*Kenneth N. Glover, Esq., for Defendants Rebecca A. Higdon and High Speed Gear, Inc.*

McGuire, Judge.

## PROCEDURAL HISTORY

1.      On January 29, 2015, Plaintiff HSG filed a Complaint against Defendants. Plaintiff's action was designated No. 15 CVS 309 by the Clerk of Superior Court of Onslow County. The Complaint brings claims for Unfair Competition and Unfair or Deceptive Trade Practices (against Defendants G-Code and Gene Higdon), Breach of Covenant of Good Faith and Fair Dealing (against Defendant Gene Higdon), Common Law Unfair Competition (against Defendants G-Code and Gene Higdon), Breach of Gene Higdon's Non-Compete (against Defendants Gene Higdon and G-Code), Breach of the Consulting Agreement (against Defendant Gene Higdon), Misappropriation of Trade Secrets (against Defendants G-Code and Gene Higdon), Tortious Interference with Contract (against Defendants Gene Higdon and G-Code), Common Law Trade Dress Infringement (against Defendant G-Code), Civil Conspiracy (against all Defendants), Disgorgement of Improperly Obtained Profits (against all Defendants),[1] Indemnification (against Defendants HSG Inc. and Becky Higdon), and Declaratory Judgment (against Defendants HSG Inc. and Becky Higdon).

---

[1] As will be discussed *infra*, Plaintiff has subsequently entered a voluntarily dismissal of this claim.

2. On April 6, 2015, Defendants Gene Higdon and Mean Gene Leather ("Mean Gene") filed their Answer and Counterclaims against HSG. Higdon and Mean Gene alleged counterclaims for Declaratory Judgment/Injunctive Relief, Common Law Trespass, Trespass to Chattels, Invasion of Privacy, Libel *Per Se*, Libel *Per Quod*, and Violation of the North Carolina Unfair and Deceptive Trade Practices Act. Higdon and Mean Gene also seek punitive damages.

3. On April 6, 2015, Defendant G-Code filed its Motion to Dismiss, seeking dismissal of HSG's Claims for Breach of Contract, Tortious Interference, and Disgorgement of Profits pursuant to Rule 12(b)(6).

4. On May 8, 2015, HSG filed its Motion to Dismiss, seeking dismissal of Defendant Higdon and Mean Gene's Counterclaims for Trespass to Chattels, Invasion of Privacy, Libel *Per Se*, Libel *Per Quod*, Violation of the North Carolina Unfair and Deceptive Trade Practices Act, and the request for punitive damages, pursuant to Rule 12(b)(6).

5. The Motions have been fully briefed and argued and are ripe for determination.

FACTUAL BACKGROUND

*HSG's Allegations*

Among other things, the Complaint alleges that:

6. The "High Speed Gear" business was founded in or around 1999 by Defendant Gene Higdon ("Higdon") and his wife, Rebecca Higdon (collectively, Gene and Rebecca Higdon are referred to as "the Higdons").[2] From August 18, 1999, to September 21, 2012, High Speed Gear was owned and operated by Defendant High Speed Gear, Inc., of which Rebecca Higdon was the President and sole shareholder.[3] High Speed Gear manufactured tactical gear. Tactical gear includes accessory products such as modular ammunition pouches, belts,

---

[2] Compl. ¶ 16.
[3] *Id.* ¶ 17.

firearm holsters, and gear bags used in military, law enforcement, hunting, and other applications. Within the tactical gear industry, High Speed Gear is known as the highest-quality tactical gear.

7.      Higdon was the key figure in the development of the High Speed Gear brand and instrumental in its product design, manufacturing, and sales operations.[4]  Higdon is widely known throughout the tactical gear industry as the founder and "public face" of High Speed Gear.  Higdon maintains significant influence in the industry.[5]

8.      In or around 2012, Matt Gadams ("Gadams") entered into negotiations with the Higdons for purchase of the "High Speed Gear" business.[6]  In anticipation of the asset purchase, Gadams formed Plaintiff HSG, LLC d/b/a "High Speed Gear" on July 31, 2012.[7] HSG is a North Carolina LLC based in a Swansboro, North Carolina. Gadams is the sole member-manager of HSG.[8]

9.      In or around September 2012, Gadams and the Higdons executed an "Asset Purchase Agreement" (Ex. A to the Complaint), pursuant to which Plaintiff purchased the assets and goodwill of HSG Inc.[9] The asset purchase closed on September 21, 2012.  In connection with the asset purchase, both Gene Higdon and Rebecca Higdon executed covenants not to compete.[10] The covenants provided that for a period of five years the Higdons would not compete with Plaintiff, contact or communicate with any of Plaintiff's past or existing clients, or hire or contract with any of Plaintiff's employees.[11] Higdon also entered into a "Consulting Agreement" with Plaintiff, pursuant to which he was to work for Plaintiff

---

[4] *Id.* ¶ 18.
[5] *Id.*
[6] *Id.* ¶ 29.
[7] *Id.* ¶ 30.
[8] Compl. ¶ 7.
[9] *Id.* ¶ 31-32.
[10] *Id.* ¶ 33.
[11] *Id.* ¶¶ 35-37.

for one year following the closing of the Asset Purchase Agreement.[12] As part of the Consulting Agreement, Higdon agreed not to disclose any of Plaintiff's "proprietary information" (defined in the Consulting Agreement).[13]

10.     Following the closing of the asset purchase, Higdon served as a consultant to Plaintiff.  As a consultant, Higdon had access to Plaintiff's business information, including its manufacturing information and expansion plans.[14] Plaintiff undertook an expansion of the business and began planning the launch of several new products.[15]  Higdon's consulting agreement expired on September 30, 2013.

11.     On January 12, 2014, without notice to Plaintiff, Higdon announced on his Facebook page that he was "leaving High Speed Gear," but would "not be leaving the community entirely."[16]

12.     Defendant G-Code, a Jacksonville, North Carolina company, also competes in the tactical gear industry.[17] Although G-Code historically produced plastic products, such as holsters, G-Code successfully introduced nylon products into the marketplace in early 2014, and it is now a viable competitor of Plaintiff.[18] G-Code has introduced products that look substantially similar to Plaintiff's.

13.     Plaintiff believes that Higdon has affiliated himself with G-Code and has used the expertise and experience that he developed with Plaintiff to accelerate G-Code's entry into the marketplace as a competitive nylon products producer.[19] This includes the use of Plaintiff's trade secrets, such as the manner and method of production, the machinery used

---

[12] *Id.* ¶¶ 33-34.
[13] *Id.* ¶ 38.
[14] Compl. ¶ 41.
[15] *Id.* ¶ 40.
[16] *Id.* ¶ 50.
[17] *Id.* ¶ 26.
[18] *Id.* ¶ 28.
[19] *Id.* ¶¶ 53-63; 77-88.

to produce the equipment, the combination and identity of materials, the sources of the materials, and its internal financial information.[20] Plaintiff has taken reasonable steps to safeguard this information by requiring that employees and visitors sign non-disclosure agreements, protecting computers with passwords, and maintaining locks on all cabinets containing sensitive information.[21]

14. While he was still under the Consulting Agreement, and after it expired, Higdon targeted certain specific and highly skilled employees in HSG's nylon sewing operations. Higdon assisted G-Code in identifying and soliciting these to come to work for G-Code. During a period of three weeks in early 2014, G-Code "hired away from HSG four of HSG's most skilled employees."[22] HSG alleges that this "left HSG short of employees in certain divisions within its nylon-sewing operations."[23]

15. On November 6, 2014, Higdon announced online that he had launched a new business, Defendant "Mean Gene Leather." Mean Gene produces tactical gear made primarily from leather, but its products also use nylon.[24] Higdon has created the impression for the public that Mean Gene and G-Code are collaborating companies, thereby diverting goodwill that Plaintiff obtained as part of the Asset Purchase Agreement.[25]

*Higdon's and Mean Gene's Counterclaim Allegations*

Among other things, Higdon's and Mean Gene's Counterclaims allege that:

16. The purchase price paid by Plaintiff was paid to High Speed Gear, Inc., and not to Higdon individually. Since Higdon received no compensation for signing the covenant

---

[20] Compl. ¶¶ 78-85.
[21] *Id.* ¶ 86.
[22] *Id.* ¶¶ 64-76.
[23] *Id.* ¶ 64.
[24] *Id.* ¶ 108-114.
[25] *Id.* ¶ 115.

not to compete, it is void and unenforceable.[26]  Higdon further alleges that the non-compete is void and unenforceable because it is "overreaching, unfair, and unconscionable."[27]

17.    A letter sent by Plaintiff's counsel to Higdon on February 3, 2014, alleging that Higdon had been violating the covenant not to compete, was published to four other individuals who are not parties to this matter.[28] Higdon alleges the contents of the letter libeled him.[29]

18.    In or around June 2014, Higdon discovered a Global Positioning System ("GPS") tracking device attached to his personal vehicle. The Onslow County Sheriff's Department later identified traced the GPS device to a private investigator firm.[30]  Higdon alleges that the GPS was placed on his vehicle by Plaintiff, and that Plaintiff thereby committed a trespass and invaded his privacy.[31]

DISCUSSION

### G-Code's Motion to Dismiss

19.    G-Code's Motion to Dismiss seeks dismissal of three claims: (i) HSG's claim for breach of Gene Higdon's non-compete contract, (ii) HSG's claim for tortious interference with contract, and (iii) HSG's claim for disgorgement of profits, insofar as those claims are asserted against G-Code.

20.    A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint or counterclaim. *Sterner v. Penn*, 159 N.C. App. 626, 628 (2003). The Court, in deciding a Rule 12(b)(6) motion, treats the well-pleaded allegations of the complaint as true. *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 225 (2010). However, mere

---

[26] Countercl. ¶¶ 14-16, 30.
[27] *Id.* ¶ 30.
[28] *Id.* ¶¶ 18-20.
[29] *Id.* ¶¶ 42-57.
[30] *Id.* ¶¶ 21-22.
[31] *Id.* ¶¶ 32-41.

conclusions of law, unwarranted deductions of fact, or unreasonable inferences are not deemed admitted. *Strickland v. Hedrick*, 194 N.C. App. 1, 20 (2008) (citation and internal quotation marks omitted). The facts and permissible inferences set forth in the complaint are to be treated in a light most favorable to the nonmoving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156 (1986). The Court should grant a 12(b)(6) motion to dismiss only if "it appears certain that [the plaintiff] could prove no set of facts which would entitle [it] to relief under some legal theory." Fussell, 364 N.C. at 225 (2010).

i. *Breach of Contract*

21.     HSG alleges that Higdon and G-Code are liable for breach of the non-compete agreement between Higdon and HSG. The G-Code Motion argues that this claim should fail to the extent that it is asserted against G-Code because G-Code is not a party to Higdon's non-compete contract.

22.     A breach of contract claim "must allege that a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach." *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 608 (1997). Plaintiff argues that North Carolina law allows an action for breach of a contract against a third party "where the contracting party is knowingly aided in his breach by a non-party to the contract."[32] In *Harwell Enters., Inc. v. Heim*, 276 N.C. 475 (1970), the North Carolina Supreme Court addressed a situation where defendant Heim, who was bound by a non-compete, allegedly breached that agreement by going into business with Ballard, a non-party to the non-compete. The plaintiff sought damages for breach of contract against *both* Heim and Ballard. The Court held that "[i]f the covenant in this case is enforceable as to Heim, and Ballard knowingly entered into a conspiracy with Heim to violate it, he would be

---

[32] Pl.'s Resp. & Br. Opp. Def. Edge-Works Manufacturing Co.'s Mot. Dismiss ("Pl.'s Opp.") 4.

jointly liable with Heim for the breach." *Id.* at 479. (citing *Sineath v. Katzis*, 218 N.C. 740 (1941)).

23. *Harwell* holds that under North Carolina law, a defendant who is not a party to a non-compete may be held jointly liable for breach of that non-compete where such defendant (i) knows of the non-compete's existence and (ii) conspires with a party bound the agreement to cause the breach. *Id.* Here, the Complaint properly alleges those elements. First, the Complaint alleges that G-Code was fully aware of Higdon's obligations to HSG pursuant to Higdon's non-compete.[33] Next, the Complaint alleges that G-Code and Higdon "have conspired to engage in unfair and unlawful conduct designed to harm Plaintiff . . . [i]n blatant disregard for the covenants made in order to induce Plaintiff to pay more than one million dollars for [Plaintiff's] business."[34] Further, it alleges that "G-Code has assisted and encouraged Gene Higdon in the violation of the restrictive covenants contained in Gene's Non-Compete, despite notice and actual knowledge of those restrictive covenants."[35] Because HSG has properly pleaded its claim against both Higdon and G-Code for breach of Higdon's non-compete contact, the Court finds that the G-Code Motion to Dismiss is DENIED as to this Claim.

ii. *Tortious Interference with Contract*

24. HSG's claim for tortious interference with contract alleges that "Gene Higdon and G-Code have maliciously interfered with HSG's relationships with its employees, including – without limitation – HSG's contractual relationships with its employees under the Employee [Non-disclosure Agreements]."[36] HSG "notified G-Code in writing about the

---

[33] Compl. ¶¶ 62, 156.
[34] *Id.* ¶ 3.
[35] *Id.* ¶ 156.
[36] *Id.* ¶ 184; HSG also alleges that G-Code interfered with its Consulting Agreement with Higdon, but has not moved for dismissal of that claim.

individuals' [Non-disclosure Agreements] and their contractual obligations to HSG."[37] The Complaint alleges that G-Code's interference with the contracts was "malicious" and "not in pursuit of any legitimate purpose, but rather was part of the Defendants' plan to harm and compete unfairly with HSG."[38]

25. In order to state a claim for the tort of interference with contract, a plaintiff must allege the following elements:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts *without justification*; (5) resulting in actual damage to plaintiff.

*United Labs, Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (emphasis added). G-Code argues that HSG bases the tortious interference claim on G-Code's hiring of HSG's former at-will employees, and that a company hiring its competitor's employees, without more, does not constitute acting "without justification." G-Code contends that HSG's claim fails because North Carolina law permits a defendant to hire its competitor's employees, so long as it is not without justification.

26. A court considers the following factors in determining whether a defendant's hiring of a competitor's employees was justified: the circumstances of the interference; the defendant's motive, conduct, or interests; the social interest in preserving the defendant's freedom of action; and the contractual interests of the other party. *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220-21 (1988). If the defendant's motive is to maliciously injure the plaintiff, his actions are not justified. *Id.* at 221. The mere fact that the employees hired were "terminable at-will does not provide the defendant a defense to the plaintiff's claim for

---

[37] *Id.* ¶ 73.
[38] *Id.* ¶¶ 183-88.

tortious interference." *Id.* "If the employer can demonstrate that the interference was wrongful and without justification" a claim for tortious interference will lie. *Id.* at 223.

27. On the other hand, where the allegations in the complaint reveal that the competitor was justified in hiring his competitor's employees, the claim must be dismissed. *Hooks*, 322 N.C. at 221-222. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Id.* (finding that a defendant's recruiting and hiring of plaintiff company's employees did not constitute interference with contract because hiring to develop a competing business was justified); *see Coordinated Health Servs., Inc. v. Primary Health Choice, Inc.*, 2006 N.C. App. LEXIS 575, at **10-13 (N.C. Ct. App. Mar. 7, 2006) (finding that the plaintiff had not shown "that defendants' conduct in hiring away plaintiff's former employees was done other than as a reasonable and *bona fide* attempt to develop defendants' business interests."). "[T]he privilege [to interfere] is conditional or qualified; that is it is lost if exercised for a wrong purpose. In general a wrong purpose exists where the act is done other than as a reasonable and *bonafide* attempt to protect the interests of the defendant which is involved." *Kuykendall*, 322 N.C. at 662 (citation omitted).

28. Here, the Complaint allegations suggest that G-Code solicited and hired HSG's employees for the purpose of putting them to work in G-Code's newly-formed nylon sewing operations making products competitive with HSG's products. While the Complaint allegations that G-Code recruited HSG's employees, standing alone, would arguably be insufficient to support a claim for tortious interference, HSG has alleged additional facts that could support its contention that G-Code's interference was malicious and unjustified. For example, HSG alleges that G-Code "targeted" HSG's most-skilled employees and only

employees in its nylon sewing division.[39] HSG specifically notified G-Code about the Non-disclosure Agreements. HSG also alleged that Gadams contacted G-Code's President, Scott Evans ("Evans"), and that Evans claimed that he had "specified that no current HSG employees would be hired," but that this was not true and that Evans was "intimately involved" in hiring a key HSG employee.[40] Finally, HSG contends that G-Code's actions left HSG's nylon sewing operations short of critical employees.

29.     The Court concludes that the collective factual allegations of the Complaint are sufficient at this stage to support HSG's claim for tortious interference, and G-Code's Motion to Dismiss is DENIED as to this Claim.

### iii.   Disgorgement of Profits

30.     HSG voluntarily dismissed its claim for disgorgement of profits, without waiving its right to seek disgorgement of profits as a remedy with respect to any remaining claim.[41] To the extent that the G-Code Motion to Dismiss seeks dismissal of this Claim, the Motion is MOOT.

### HSG's Motion to Dismiss

31.     HSG has moved to dismiss Gene Higdon's and Mean Gene's[42] Third through Seventh Counterclaims for trespass to chattels, invasion of privacy, libel *per se* and libel *per quod*, unfair and deceptive trade practices, and the counterclaim for punitive damages.

### i.   Trespass to Chattels

32.     HSG contends that Defendants' counterclaim for trespass to chattels should be dismissed pursuant to Rule 12(b)(6) because Defendants failed to state a claim upon which

---

[39] Compl. ¶ 147.
[40] *Id.* ¶¶ 71-72.
[41] Voluntary Dismissal (July 7, 2015).
[42] For ease of discussion in this section of the Opinion and Order, the Court will refer to Gene Higdon and Mean Gene Leather collectively as "Defendants."

relief may be granted. HSG asserts that this claim should be dismissed because the alleged conduct underlying the claim neither interfered with Higdon's use of his personal property nor amounted to an actionable dispossession of his property.

33. In addition to trespass by intruding on a person's real property, North Carolina recognizes the separate tort of trespass to chattels, which is a trespass to personal property. "The basis of a trespass to chattel cause of action lies in 'injury to possession.'" *Fordham v. Eason*, 351 N.C. 151, 155 (1999) (quoting *Motley v. Thompson*, 259 N.C. 612, 618 (1963)). A claim for trespass to chattels must "demonstrate that [the plaintiff] had either actual or constructive possession of the personalty or goods in question at the time of the trespass, and that there was an unauthorized, unlawful interference or dispossession of the property." *Id.* (citations and quotations omitted). One is liable for trespass to chattels *only* if (1) a person dispossesses the other of the chattel; or (2) the chattel is impaired as to condition, quality, or value; or (3) the possessor is deprived of use of chattel for a substantial time; or (4) bodily harm is caused to the possessor or some person or thing in which possessor has a legally protected interest. *Restatement (Second) of Torts* § 218. A party may not merely claim that another accessed or touched his property without permission; instead he must show that such access or touching actually interfered with his use of the property in some fashion. *Accord id.* cmt. e ("The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel.").

34. Higdon claims that HSG meddled with his personal vehicle by attaching a GPS tracking device to it.[43] Higdon does not allege that HSG's conduct effectively dispossessed him of his truck or deprived him of his ability to drive the truck; in fact, Higdon alleges that

---

[43] Countercl. ¶¶ 35-37.

he drove the truck from his home, to a town in a separate county, and then back to his home, all with the device attached.[44] Instead, Higdon bases his claim on the mere affixation and/or presence of the GPS device. While there are no North Carolina cases on point regarding whether the unauthorized placement of a GPS device on another's vehicle constitutes a trespass to chattel, the Court of Appeals has recognized that placing a boot on a car's wheel constitutes an "interference" with the property because "the main purpose of a car is transportation, and [] one cannot drive around with a boot attached to the wheel of one's car." *Kirschbaum v. McLaurin Parking Co.*, 188 N.C. App. 782, 787 (2008). Here, however, Higdon fails to allege how placing a GPS on the bottom of his truck actually interfered with his use of the truck, impaired the operation of the truck, or damaged his truck in any way.

35.     Higdon's argument that the U.S. Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), supports his claim is incorrect, as the holding in *Jones* is inapposite here. The Court in *Jones* determined that the government's warrantless attachment of a GPS device to an individual suspect's vehicle, and subsequent use of that device to monitor the vehicle's movements on public roads, was a violation of the individual's Fourth Amendment rights. *Id.* at 948. Higdon's first argument that *Jones* found that the government "committed an unlawful trespass," misstates, or in the very least misconstrues, the holding in *Jones*.[45] *Jones* did not consider the question of whether the government had committed the tort of trespass to chattels; rather, the Court solely considered whether the government's conduct constituted a search or seizure within the meaning of the Fourth Amendment. *Jones*, 132 S. Ct. at 948. Although the majority opinion applied what Justice Scalia termed as the "common-law trespassory test," the Court explicitly explained that it was referring to the concept of trespass as it existed in English common law at the time the

---

[44] *Id.* ¶ 21.

[45] Df. Albert Gene Higdon, Jr.'s Mem. Opp. Pl.'s Mot. to Dismiss ("Higdon Brief") 3.

Fourth Amendment was adopted in the 18th century, not the present-day conception of the trespass to chattels tort. *Id.* at 949-52 (discussing the English common law as it existed at the adoption of the Fourth Amendment); *id.* at 953 ("What we apply is an 18th-century guarantee against unreasonable searches, which we believe must provide at a minimum the degree of protection it afforded when it was adopted.") (emphasis omitted). Therefore, whether HSG, which is not a government actor, placing a GPS device on Higdon's car would violate the 18th century standards of trespass is immaterial to determining if such conduct constitutes a trespass to chattel under present-day North Carolina law.

36. In fact, as the concurrence in *Jones* articulates, attaching a GPS device to another's vehicle probably would *not* constitute a trespass to chattel under modern tort law. *Id.* at 961 (Alito, J., concurring) ("Attaching such an object is generally regarded as so trivial that it does not provide a basis for recovery under modern tort law."). Justice Alito also discusses the fact that historically, a claim for trespass to chattels could be viable if there was a violation of "the dignitary interest in the inviolability of chattels," but today the tort requires more than simply touching or attaching an object to a chattel. *Id.* at 957 n.2. (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, <u>Prosser & Keeton on Law of Torts</u> 87 (5th ed. 1984)). In order to recover on a present-day claim for trespass to chattels, the plaintiff must show that the chattel was actually damaged, or that his use of the chattel was interfered with. *Id.* at 957 n.2.; *see also* Restatement (Second) of Torts § 218 cmt. e.

37. The Court concludes that *Jones* cannot be interpreted as establishing that a private citizen can be held liable for trespass to chattels by merely attaching to another's car a GPS device, a small, light object that does not interfere in any way with the car's operation. Higdon's allegation that HSG merely attached a GPS device to his vehicle cannot alone support a claim for trespass to chattels in the absence of a showing that HSG's conduct damaged or interfered with his ability to use the vehicle. The Court concludes that the

pleadings do not support a viable claim for trespass to chattels, and HSG's Motion to Dismiss Gene Higdon's and Mean Gene's Third Counterclaim for trespass to chattels is GRANTED as to this Claim.

*ii. Invasion of Privacy*

38. Higdon's counterclaim for invasion of privacy also is based on the alleged affixing of a GPS device to his vehicle. Higdon alleges that by using the GPS "and otherwise conducting a state wide surveillance of his activities" HSG has "intruded upon his "solitude, seclusion or private affairs and concerns."[46] HSG contends that this claim should be dismissed because Higdon did not allege facts that establish any actual intrusion of HSG into his private affairs or personal information.

39. To prove an invasion of privacy in North Carolina, one must show (1) an intentional intrusion upon the solitude or seclusion of another or his private affairs and (2) that the intrusion would be highly offensive to a reasonable person. *Toomer v. Garrett*, 155 N.C. App. 462, 479 (2002) (citing *Miller v. Brooks*, 123 N.C. App. 20, 26-27 (1996). "Generally, there must be a physical or sensory intrusion or an unauthorized prying into confidential personal records to support a claim for invasion of privacy by intrusion." *Broughton v. McCatchy Newspapers, Inc.*, 161 N.C. App. 20, 29 (2003). Even when a plaintiff asserts that a defendant engaged in "unauthorized prying," a claim for invasion of privacy is not viable if all that is learned about the plaintiff is public information. *Id.* at 30. ("There can be no invasion of privacy claim based upon the use of public records as to which plaintiff had no expectation of privacy."). Moreover, "'a person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to

---

[46] Countercl. ¶ 39.

another.'" *State v. Parker*, 183 N.C. App. 1, 7 (2007) (quoting *United States v. Knotts*, 460 U.S. 276, 281 (1983)).

40.     Significantly, courts in other jurisdictions have addressed the placement of a GPS device in the context of the invasion of privacy tort. For instance, a New Jersey court held that the secret placement of a GPS device in a vehicle to track a person without his knowledge did not constitute an invasion of privacy. *Villanova v. Innovative Investigations, Inc.*, 420 N.J. Super. 353 (App. Div. 2011). In that case, a wife placed a GPS device in the glove compartment of her husband's vehicle to investigate his "suspected infidelities," for approximately forty days. *Id.* at 355. The court concluded that a cause of action for invasion of privacy was not established because there was no evidence "that any surveillance of plaintiff extended into private or secluded locations that were out of public view and in which plaintiff had a legitimate expectation of privacy." *Id.* at 363. Similarly, an Illinois court held that the attachment of a GPS device to another's vehicle did not constitute an invasion of privacy where the plaintiffs did not allege that the GPS device captured any private activity. *Troeckler v. Zeiser*, 2015 U.S. Dist. LEXIS 27594, *7 (S.D. Ill. Mar. 5, 2015). The court found that the plaintiffs "failed to plead how a passerby on the street or an individual in another vehicle could not capture the same information that the tracking device captured and thus [] failed to plead the disclosure of a private fact." *Id.* The Court finds the New Jersey and Illinois opinions persuasive.

41.     Here, Higdon claims that HSG invaded his privacy by tracking his movements in his vehicle using the GPS device. The facts in this case are analogous to *Villanova* and *Troeckler* to the extent that Higdon has failed to plead that the placement of the GPS device enabled HSG to obtain any *private* information about him. Higdon alleges only that he traveled from his home in Onslow County to Robbins, North Carolina, and back home with the GPS attached to his vehicle, a journey on which he could have been publicly observed.

Accordingly, any information transmitted by the GPS device attached to Higdon's vehicle could have been obtained by observing the vehicle on public roads, where Higdon has no reasonable expectation of privacy.

42. Higdon also argues that the Supreme Court's decision in *Jones* supports his position in that it repudiated the long-standing principle that an individual has no reasonable expectation of privacy in his travel on public roads. This argument, however, misinterprets the holding of *Jones*, which expressly did not address that issue. Instead, the Court referenced, but did not overrule, its holding in *United States v. Knotts*, 460 U.S. 276, 281 (1983), that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," and made clear that it did *not* express an opinion as to whether observing such movements by "electronic means" would constitute an "unconstitutional invasion of privacy." *Jones*, 132 S. Ct. at 954-54. In addition, the court in *Troeckler* found that the plaintiffs' argument that *Jones* supported their position that the placement of a GPS device constituted an invasion of privacy lacked merit. *Troeckler*, 2015 U.S. Dist. 27594, at *7-8. The *Troeckler* court concluded that *Jones* was inapposite, as *Jones* solely holds that the placement of a GPS device on a vehicle constituted a search for Fourth Amendment purposes, and the requirements for a search under the Fourth Amendment are different than the elements of the invasion of privacy tort at issue. *Id.*

43. For the foregoing reasons, the Court concludes that Higdon failed to plead facts that support a cause of action for the invasion of privacy tort under North Carolina law. Accordingly, the Court finds that HSG's Motion to Dismiss Gene Higdon's and Mean Gene's Fourth Counterclaim for invasion of privacy is GRANTED as to this Claim.

*iii. Libel Per Se and Libel Per Quod*

44.     Higdon's Fifth and Sixth Counterclaims for Libel *Per Se* and Libel *Per Quod* both arise solely from the February 3, 2014, letter allegedly published by HSG's counsel to Edge-Works Manufacturing Company and several other individuals who are not a party to this action. HSG contends that these counterclaims should be dismissed because they are barred by the applicable statute of limitations.

45.     In North Carolina, claims for libel are subject to a one-year statute of limitations. G.S. § 1-54(3). An action for libel must be commenced within one year from the time the action accrues, which is the date of the publication of the defamatory words. *Philips v. Pitt Cnty. Mem. Hosp., Inc.*, 222 N.C. App. 511, 526 (2012) (citing *Gibson v. Mut. Life Ins. Co. of N.Y.*, 121 N.C. App. 284, 287 (1996). "A statute of limitations defense may properly be asserted in a Rule 12(b)(6) motion to dismiss if it appears on the face of the complaint that such a statute bars the claim." *Horton v. Carolina Medicorp*, 344 N.C. 133, 136 (1996) (citing *Hargett v. Holland*, 337 N.C. 651, 653 (1994)). Once a defendant raises a statute of limitations defense, the burden shifts to the plaintiff to prove that the action was brought before the relevant statute of limitations has expired. *Horton*, 344 N.C. 133, 136 (citing *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985); *Little v. Rose*, 285 N.C. 724, 727 (1974)).

46.     "Publication occurs when the allegedly defamatory material is read by a third party." *Ward v. Buckeye Homeowner's Ass'n*, 2011 N.C. App. LEXIS 1312, at *4 (June 7, 2011) (unpublished) (citing *Matthews, Cremins, McLean, Inc. v. Nichter*, 42 N.C. App. 184, 188 (1979). In *Ward*, the Court of Appeals held that in the absence of other evidence regarding the date of a letter's receipt, the fact that it is dated more than twelve months before the filing of a libel claim is sufficient "to raise the statute of limitations in a motion to dismiss." *Id.* at *5 (finding that, when the complaint did not allege the specific date on which the allegedly defamatory letter was "published," or read, the date printed on the letter was

sufficient to allow the defendant to raise a statute of limitations defense and require the plaintiff to prove that the defamation was published within the statute of limitations).

47.     Higdon's only allegation regarding the date of publication is that "on or about February 3, 2014, HSG "caused to be sent" the defamatory letter.[47] Higdon's Counterclaims were not filed until April 6, 2015, over fourteen months after the date the letter was allegedly mailed. This is sufficient to raise a statute of limitations defense and put the burden on Higdon to prove that his claim was timely filed. In response, Higdon appears to argue that the date that the third-parties actually received the letter cannot be determined without conducting discovery, but puts forth no proof that they received the letter less than one year prior to his filing of the counterclaims. "There are many rulings to the effect that the mailing of a letter properly addressed presumes a delivery to the addressee." *York v. York*, 271 N.C. 416, 420 (1967) (citing *Model Mill Co. v. Webb*, 164 N.C. 87 (1913); *First Nat'l Bank v. Hall*, 174 N.C. 477 (1917); *Standard Trust Co. v. Commercial Nat'l Bank*, 166 N.C. 112 (1914); *White v. Dixie Fire Ins. Co.*, 226 N.C. 119 (1946); *Holloman v. S. Ry. Co.*, 172 N.C. 372 (1916)). In North Carolina, there is a presumption that the addressee will receive correctly addressed mail with postage prepaid in the regular course of mail. *See, e.g., Parnell-Martin Supply Co. v. High Point Motor Lodge, Inc.*, 277 N.C. 312, 321 (1970); *State v. Teasley*, 9 N.C. App. 477, 486 (1970); *Crown Cent. Petroleum Corp. v. Page-Myers Oil Co.*, 255 N.C. 167, 171 (1961). Thus, Higdon has not overcome this presumption that the letter was not received in the regular course of mail, and therefore he has not met his burden of showing that the relevant statute of limitations has not expired. *See Horton*, 344 N.C. at 136; *Pembee Mfg. Corp.*, 313 N.C. at 491; *Little*, 285 N.C. at 727.

---

[47] Countercl. ¶ 18.

48. The Court concludes that Higdon's Counterclaims for libel *per se* and libel *per quod* are barred by the statute of limitations, the Court need not address the parties' arguments pertaining to privilege and failure to plead special damages. Accordingly, HSG's Motion to Dismiss Gene Higdon's and Mean Gene's Fifth and Sixth Counterclaims for Libel is GRANTED as to these Claims.

### iv. Unfair and Deceptive Trade Practices

49. Higdon apparently bases his Counterclaim for unfair and deceptive trade practices on two allegations: (1) the allegation that HSG tracked his movements through use of the GPS, and (2) the allegation that HSG libeled him by publishing the February 3, 2014, letter to third parties to this lawsuit.[48] HSG contends that this counterclaim should be dismissed because HSG's alleged wrongful activities are neither "in or affecting commerce" nor "unfair or deceptive." *See Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88 (2013).

50. For a claim for unfair and deceptive trade practices, the party bringing the action must show (1) the defendant committed an unfair or deceptive act, (2) the act was in or affecting commerce, and (3) the act proximately caused the plaintiff's injury. *Id.* at 88 (citing *Dalton v. Camp*, 353 N.C. 647, 656 (2001). To be "in or affecting commerce," the plaintiff must prove the defendant's act was related to its "business activities," or its "'regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized.'" *White v. Thompson*, 364 N.C. 47, 52 (2010) (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594 (1991)).

51. Higdon's allegation that HSG tracked his movements by attaching a GPS device to his "private vehicle" is not sufficient to support a claim for unfair and deceptive

---

[48] *Id.* ¶¶ 58-62.

trade practices. Higdon does not allege that he used his private vehicle for business or that the movements that were allegedly tracked related in any way to his business. Higdon also fails to allege how such conduct could conceivably have caused injury to him or to his business. The alleged conduct simply was not "in or affecting commerce" for purposes of imposing liability. Accordingly, HSG's Motion to Dismiss Gene Higdon's and Mean Gene's Seventh Counterclaim for unfair trade practices, to the extent it is based on the allegation that HSG tracked the movements of his private vehicle using a GPS, is GRANTED as to this Claim.

52.     A claim of libel *per se* that defames a party in its business activities may be the basis of a claim for unfair and deceptive trade practices "in or affecting commerce" in violation of G.S. § 75-1.1. *Ellis v. N. Star Co.*, 326 N.C. 219, 225-26 (1990). Relying on *Ellis*, however, HSG argues that the dismissal of Higdon's libel claims necessitates the dismissal of his claim for violation of G.S. § 75-1.1 based on the libel claim.[49] In *Ellis*, a "jury found as a fact" that the defendant's mailing of a letter regarding the plaintiff and his business did not libel the individual plaintiff. *Id.* at 227. The North Carolina Supreme Court held that "[a]s the plaintiff [ ] alleged no other act of the defendants in support of his unfair or deceptive practices claim, the jury's findings against him in this regard on the libel claim *necessarily were findings rejecting the facts alleged by him* in his unfair or deceptive practices claim. *Id.* (emphasis added). In the present case, however, the Court dismissed Higdon's counterclaims for libel based on the statute of limitations, and not on the basis that the facts underlying the alleged libel did not occur or that the alleged defamatory statements were not libelous. Therefore, here, unlike in *Ellis*, the Court cannot conclude that Higdon cannot proceed with the G.S. § 75-1.1 claim based on the statements in the letter, even if Higdon is barred from

---

[49] Pl.'s Br. in Supp. of Mot. to Dismiss at 14.

recovering for those statements under a libel claim. For the foregoing reasons, the Court finds that HSG's Motion to Dismiss Gene Higdon's and Mean Gene's Seventh Counterclaim for unfair and deceptive trade practices, to the extent it is based on HSG's conduct with respect to the February 3, 2014, letter, is DENIED as to this Claim.

v. *Punitive Damages*

53. Higdon claims punitive damages, not set out in a separate cause of action, but in several individual causes of action and in his prayer for relief. HSG contends that this claim should be dismissed because Higdon has not identified with specificity an aggravating factor allegedly supporting punitive damages as required by Rule 9(k) of the North Carolina Rules of Civil Procedure.

54. "A demand for punitive damages shall be specifically stated, except for the amount, and the aggravating factor that supports the award of punitive damages shall be averred with particularity." G.S. § 1A-1, Rule 9(k). Aggravating factors that can support an award of punitive damages are fraud, malice, and willful or wanton conduct. G.S. § 1D-15. It is not sufficient that the party seeking punitive damages merely states a cause of action and then asserts he is entitled to punitive damages as a result of that claim. *Barlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 84-85 (2008) (citing *Shugar v. Guill*, 51 N.C. App. 466, 469 (1981)). In *Shugar*, the Court of Appeals reasoned that the plaintiff's only reference to his claim for punitive damages was his statement that "the defendant, without just cause, did intentionally, willfully and maliciously assault and batter the plaintiff," and that this statement alone was a mere conclusion of the plaintiff. *Shugar*, 51 N.C. at 470; *see id.* at 472-73. Thus, the Court held that the plaintiff's pleading did not sufficiently allege punitive damages, as "[a] mere conclusory statement that the wrongful act was advanced in a malicious, wanton, or willful manner is insufficient." *Id.* at 470 (citation omitted).

55.     In the instant case, Higdon cites to *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 112 (1976), for the proposition that aggravated conduct supporting an award of punitive damages when an identifiable tort is alleged may be established by alleging "behavior extrinsic to the tort itself." Higdon contends that he has made such allegations in his Counterclaims where he alleges "HSG's conduct has been aggravated, outrageous, malicious and fraudulent, deliberately intending to injure Higdon."[50] Higdon has failed to allege the presence of any aggravating fact with particularity, as the only other allegations regarding punitive damages are conclusory recitals at the end of five of his claims for relief that Plaintiff's conduct has caused him "to be entitled to punitive damages . . . in an amount to be determined at trial."[51] Thus, Higdon's claim for punitive damages does not meet the heightened pleading standard set out in Rule 9(k), and Court finds that HSG's Motion to Dismiss Gene Higdon's and Mean Gene's claim for punitive damages is GRANTED as to this Claim.

THEREFORE, IT IS ORDERED, based upon the foregoing FINDINGS and CONCLUSIONS that:

56.     G-Code's Motion to Dismiss is DENIED as to HSG's Claims for Breach of Contract and Tortious Interference.

57.     HSG's Motion to Dismiss is GRANTED as to Defendant Albert Gene Higdon, Jr.'s and Mean Gene Leather's Third, Fourth, Fifth, and Sixth Counterclaims for Trespass to Chattels, Invasion of Privacy, Liber *Per Se*, Liber *Per Quod*, and the request for punitive damages.

58.     HSG's Motion to Dismiss is GRANTED in part as to Defendant Albert Gene Higdon, Jr.'s and Mean Gene Leather's Seventh Counterclaim for Unfair and Deceptive

---

[50] Countercl. ¶ 66.
[51] *Id.* ¶¶ 34, 37, 41, 48, 57.

Trade Practices, to the extent that it is based on the allegation that HSG tracked the movements of Higdon's private vehicle using a GPS. To the extent that the Counterclaim for Unfair and Deceptive Trade Practices is based on HSG's conduct with respect to the February 3, 2014 letter, HSG's Motion to Dismiss is DENIED as to this claim.

This the 5th day of October, 2015.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases